IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JIMMY RILEY,

                       Plaintiff,

       v.

BRIAN LANGE, JACOB ZIMMER,
ADAM THIELEN, MICHAEL ROTH,
CODY KEEHN, JULIE PINTZ,
ANDREW HULCE, MATTHEW
SCULLION, ANDREW SIMCOX,
and GARY BOUGHTON,

                Defendants.

OPINION AND ORDER

20-cv-736-wmc

---

*Pro se* plaintiff Jimmy Riley seeks summary judgment on his constitutional and state law claims stemming from self-harm incidents in November 2019, as well as challenging an alleged policy or practice at the Wisconsin Secure Program Facility ("WSPF") that precludes frontline staff from intervening until inmates actually harm themselves. (Dkt. #34.) Defendants' cross motion for summary judgment argues the undisputed evidence shows they neither acted with deliberate indifference to a serious risk that Riley would harm himself nor acted negligently as to each specific defendant or by policy, and that the state defendants are also all entitled to qualified immunity on Riley's constitutional claims. (Dkt. ##53, 57.) For the following reasons, the court will: (1) deny Riley's motion; (2) grant in part and deny in part defendant Julie Pintz's motion; and (3) grant in part and deny in part the state defendants' motion.

UNDISPUTED FACTS[1]

### A. The Parties

In November of 2019, Riley was an inmate at WSPF and placed in the Restrictive Housing Unit with a history of engaging in self-harm.  Defendant Julie Pintz is a nurse who works for a private company that contracts with the Wisconsin Department of Corrections ("DOC") to provide services at WSPF, while the remaining defendants are all state employees who during all relevant times worked at WSPF as follows:  Warden Gary Boughton, Captain Andrew Hulce, Sergeant Brian Lange, Sergeant Jacob Zimmer, Lieutenant Matthew Scullion, Correctional Officers Cody Keehn, Adam Thielen, and Michael Roth, and Psychological Consultant and Department Supervisor Andrew Simcox.

### B. DOC Suicide Prevention Policy

None of the named state defendants create or approve DOC policy.  Policies for DOC's Division of Adult Institutions ("DAI") are developed and reviewed by subject matter experts, then approved by the DAI administrator.  The DAI Policy Committee, which defendant Boughton chaired in 2019, reviews policies for clarity, accuracy, and formatting.

DAI Policy 500.700.25 concerns suicide prevention in adult correctional facilities. In keeping with that policy, all DAI employees attend yearly mandatory suicide prevention

---

[1] Unless otherwise indicated, the following facts are material and undisputed.  Consistent with its practice, the court has drawn these facts from the parties' proposed findings and the evidence of record viewed in a light most favorable to plaintiff.  *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

training.   Moreover, all DAI staff are required to refer immediately to Psychological Services Unit ("PSU") staff any inmate who presents with previously unrecognized, serious mental health needs *or* who has a significant worsening of symptoms, including risks of self-harm, severe depression or anxiety.   Further, correctional officers are specifically trained to notify their supervisors if an inmate expresses self-harm or suicidal ideations *and* must remain at that inmate's cell front to survey and secure the area, as well as alert other staff to call for medical personnel, and security back-up.   Officers are also taught to follow the same protocols if they discover an inmate attempting self-harm or suicide, and they are trained to verbally engage with the inmate and to stop any inmate who is actively engaging in self-harm.   Finally, inmates that express self-harm or suicidal ideations, engage in self-harm, or attempt suicide are to be placed on clinical observation status and housed in cells with large, clear glass windows for easier observation, although only certain psychology staff, crisis intervention workers, physicians, and wardens are authorized to place inmates in clinical observation.

### C. Riley's First Claimed Overdose

Early in the morning of November 5, 2019, Riley pushed his cell intercom button and told Sergeant Lange that he needed to be placed on clinical observation.   Because Lange simply turned off the intercom, Riley pushed his intercom button several more times. When Lange finally responded, Riley told him to tell a supervisor that he needed to be placed on observation, to which Lange again apparently turned off the intercom, without response.   For several minutes, Riley continued to push his intercom button before Lange responded again, at which time Riley asked Lange to send someone to his cell.

3

Officer Thielen came to Riley's cell a few minutes later, and Riley told the officer that he was suicidal and needed to go on observation. However, a nearby inmate distracted Thielen at that point, and he left before addressing Riley's concerns. After resuming his pushing of the intercom button and telling Lange that he was suicidal and needed to go on observation, and Riley maintains that Lange once again turned off his intercom without response. Further, Riley has submitted an affidavit from the inmate distracting Thielen, which attests that he heard Riley tell both Officer Thielen and Sergeant Lange that he was suicidal at that time. (Dkt. #38-8 at ¶¶ 4-5.)

Even so, Sergeant Lange disputes that he ever turned off his intercom or ignored Riley. Rather, Lange asserts that he told his supervisor Captain Hulce about Riley's concerns, and then directed Thielen to go speak with Riley. For his part, Officer Thielen disputes that Riley ever told him that he was suicidal. However, there is no dispute that after Thielen left, Riley swallowed many acetaminophen pills in view of a nearby inmate, who in turn notified Sergeant Lange. Defendant Thielen as well as a nondefendant officer then returned to Riley's cell at 5:35 a.m. and remained there until a shift change.

At 6:10 a.m., Lieutenant Scullion also responded to the report of Riley's reported overdose. At that point, Riley was uncooperative, initially refusing to exit his cell and telling staff that they would have to fight him. When Riley eventually complied, he was then taken to the HSU where he refused to allow a nurse to examine him. The nurse then called the on-call doctor, who determined that Riley needed hospital treatment. The time it takes to get an inmate ready and to transport the inmate to a hospital depends on many factors, including where the inmate is in the institution, his cooperation with staff

instruction, and how quickly security staff can be assigned to escort the inmate from the institution.  A vehicle must also be brought to the intake area.  Moreover, Riley had to be stripped for contraband, given new clothes, and placed in full restraints.

While the parties dispute whether Riley refused to go to the hospital, there is no dispute that Riley left WSPF for the hospital at 7:20 a.m., and diagnostic testing showed "that all liver functions were within normal limits" and his "[a]cetaminophen levels were elevated but not enough to initiate treatment." (Dkt. #62-1 at 2.)  After about four hours later (at 11:23 a.m.), Riley returned to WSPF, and he was placed on observation status. While Riley then reported abdominal pain and nausea without vomiting, a doctor told him that there "did not seem to be any permanent damage done" and that his labs would be repeated in 48-72 hours to be sure.  (*Id.*)

The next day, November 6, Riley was placed on a no-KOP restriction, meaning that he was not allowed to keep any medication on his person or in his cell going forward and notice of this restriction was sent to various personnel and departments, including the Lieutenant's Office and the Nurses' Station.   Nevertheless, when Riley submitted medication refill requests for Tylenol on November 7 and November 11, 2019, he claims that Nurse Pintz issued him Tylenol in bottles, rather than in blister bubble packs for staff to administer.[2]

### D. Riley's Attempt to Return Medication

Several days later, however, on November 20, 2019, Riley gave his Tylenol to

---

[2] In contrast, Pintz disputes that she sent Riley this medication.

Officer Keehn during the afternoon medication pass, telling him that he was on a no-KOP medication restriction and could not have the medication.  In turn, Keehn gave the medication to Sergeant Zimmer, telling him that Riley claimed he was on a no-KOP restriction even though Riley's cell door listed no such restriction.  Keehn asserts that there was no medication restrictions for Riley listed on the restriction board next to the Sergeant's Station either, but Riley contends that the Sergeant's Station had received a copy of his no-KOP restriction.  (Dkt. #97 at ¶ 85.)

Regardless, Zimmer took the medication and placed it in the medication bin to be returned to the HSU.  He later verified in the inmate database that Riley had a no-KOP restriction and asked Riley for his no-KOP letter.   Riley showed Zimmer the letter, prompting Zimmer to thank Riley for turning in the pills.

After Keehn gave the pills to Zimmer, however, the HSU delivered more keep-on-person medication for Riley.   Keehn attests that because he cannot refuse to give medication to inmates, he returned the Tylenol with the additional medication to Riley during the next medication pass.  In turn, Riley claims he reminded Keehn of his no-KOP restriction and that he could not have the medication, to which Keehn told him, "Just take them.  I don't care."  (Dkt. #37 at ¶ 37.)  While Keehn disputes that this exchange occurred at all, there is no dispute that Riley never expressly told Keehn that he intended to harm himself.  Finally, another inmate attests to having heard Riley's exchanges with Zimmer and Keehn and confirms Riley's version of those events.  (Dkt. #38-8 at ¶¶ 8-10.)

### E.  Riley's Second Claimed Overdose

Some 19 days after his first overdose, during the afternoon medication pass on

6

November 24, 2019, a nondefendant officer called Officer Roth to Riley's cell because he had covered his window and refused to respond.  Roth's body camera captured sound and video of this exchange.  Specifically, after Roth announced himself and asked Riley what was going on, a nearby inmate told him that Riley had a migraine and was upset that he did not get Tylenol.  (Dkt. #68-4 at 0:22-1:15.)   While Roth was looking for the medication, Riley partially uncovered his cell window and told Roth that he was upset after having to wait all night with a migraine for his requested bottle of Tylenol on the medication cart.  (*Id.* at 1:19-2:39.)  Roth then explained that there should not even be a bottle of Tylenol on the cart for Riley, because the no-KOP restriction requires that his medication be kept by unit staff in a blister pack; thus, Roth said he would call the HSU about the issue.  (*Id.* at 2:40-3:38.)

When Riley next asked to see a supervisor (or "white shirt"), Roth explained that a supervisor was not going to come to Riley's cell for this issue, and in any event, he would not do anything more than Roth would do.  (*Id.* at 3:45-4:29.)  As Roth reiterated that he would call HSU and try to get Riley some Tylenol, Riley began covering up his cell window again, so Roth told Riley that he did not time for this behavior and left his cell front.  (*Id.* at 4:30-36.)  Even then, however, Riley never told Roth that he was suicidal, or had threatened self-harm.  Moreover, Roth could no longer stay at Riley's cell front because the unit as a whole was busy at that time with a medication pass, mealtime and other daily operations.

Later that night, Riley ingested the Tylenol that Keehn had returned to him on November 20 in a second suicide attempt.  After being returned to the hospital for

treatment where Riley again reported stomach pain and nausea, he nevertheless declined charcoal and sorbitol, and the treating physician noted no "vomiting/diarrhea/constipation" or "HA/visual or auditory changes" or "f/c/s/ or rigors" or "sz activity." (Dkt. #38-12 at 1.) Riley was then discharged with instructions to "[f]orce fluids," continue his medications as prescribed, but without access to Tylenol, and to follow up with his psychiatrist. (*Id.* at 6.)

As a result, Riley claims that he endured severe abdominal pain, kidney damage, gastric distress, vomiting, dizziness, and bloody stool while on observation status and for several weeks afterward. From September 2020 through March 2022, Riley also submitted seven health services requests regarding "side pain" and wondering whether that pain was the result of his twice overdosing on Tylenol. (Dkt. #38-13.)

## OPINION

A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact, and judgment is appropriate as a matter of law. Federal Rule of Civil Procedure 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. If the moving party makes a showing that the undisputed evidence establishes their entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252). Finally, where a party's "story is 'blatantly contradicted' by the video such that no

8

reasonable jury could believe it, [courts] do not credit his version of events." *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## I. Plaintiff's Policy or Practice Claim

To begin, plaintiff's policy and practice claims against supervisory officials Boughton, Simcox, Hulce, Scullion, Zimmer, and Lange require little discussion. Specifically, he alleges that they each implemented or enforced a deficient policy or practice requiring that inmates in restrictive housing actively engaged in self-injurious behaviors before frontline staff can intervene. Certainly, "policymakers responsible for prison operations must take diligent precautions to respond to and mitigate a meaningful risk of inmate suicide." *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020). However, it is undisputed that none of these defendants make DOC policy, and plaintiff offers no evidence in support of his policy and practice claims beyond his own general assertions that the alleged policy or practice exists and is well-known at WSPF, much less that defendants ignored its enforcement. (Dkt. ##35 at 5-6, 8; 37 at ¶ 55.)

As the court explained to plaintiff at screening, he would have to do more than simply allege the existence of a policy to proceed further on these claims. (Dkt. #12 at 9.) Since plaintiff has offered nothing more, the court will grant these defendants summary judgment on plaintiff's policy and practice claims.

## II. Specific Incidents of Injury

Plaintiff was also granted leave to proceed on Eighth Amendment and state-law

negligence claims arising out of specific incidents when prison staff allegedly failed to respond adequately to a serious risk that he would harm himself or failed to provide him timely necessary medical attention after he did so. (*See* dkt. #12 at 11.)

The Eighth Amendment prohibits prison officials from responding with "deliberate indifference" to a "substantial risk of serious harm" to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). "Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference require more than negligence, or even gross negligence, but something less than purposeful acts. *Farmer*, 511 U.S. at 836.

Thus, prison officials have a duty to intervene to protect an inmate from acts of self-harm "up to and including suicide." *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) (citing *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012)). The Court of Appeals for the Seventh Circuit has reasoned "in numerous cases" that suicide, attempted suicide, and other acts of self-harm pose "a serious harm" that satisfies the objective component of an Eighth Amendment claim. *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012) (citing cases); *see Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). To satisfy the subjective component, plaintiff must show that each defendant subjectively knew he "was at substantial risk of committing suicide" and "intentionally disregarded the risk." *Collins*, 462 F.3d at 761 (citing *Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)).

10

The Eighth Amendment also recognizes a prisoner's right to receive adequate medical care.  *Estelle v. Gamble*, 429 U.S. 97 (1976).   To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent.  *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  An "[i]nexplicable delay" that exacerbates a prisoner's medical condition or unnecessarily prolongs suffering can show deliberate indifference."  *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citing *Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007)).

Under Wisconsin law, a claim for negligence includes the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff.  *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (2001).  The court applies these constitutional and state common law requirements to plaintiff's remaining claims as discussed below.

### A.  Defendants Roth, Zimmer, and Scullion are Entitled to Summary Judgment

First, the court will grant summary judgment in favor of defendants Roth, Zimmer, and Scullion.  Beginning with Officer Roth, the parties do not dispute what the video footage shows:  he knew plaintiff was on a no-KOP restriction and tried to resolve plaintiff's request for Tylenol to relieve his migraine, but plaintiff rebuffed his efforts.  Thus, when Roth left plaintiff's cell, he had no reason to believe that plaintiff had any medication in his cell, and plaintiff never stated that he was experiencing suicidal or self-harm ideations.  No doubt this is why plaintiff does not press his claim against Roth in reply.  Regardless,

because a jury could not reasonably conclude from this evidence that Roth acted negligently on this record, let alone acted with deliberate indifference to a substantial risk of serious harm to plaintiff, he is entitled to summary judgment on plaintiff's claims against him.

Based on the undisputed facts, Sergeant Zimmer is also entitled to summary judgment in his favor.  In particular, plaintiff concedes that after Officer Keehn gave Zimmer the Tylenol, he "investigated and verified" that plaintiff was on a no-KOP restriction (dkt. #95 at 4), and plaintiff presented no evidence from which a reasonable jury could infer that Zimmer was aware that Keehn later returned the Tylenol to plaintiff. Because there is no basis for a jury to find that Zimmer recklessly disregarded a serious risk of harm to plaintiff or breached a duty of care, plaintiff's claims against Zimmer will not proceed to trial.

As for Lieutenant Scullion, plaintiff maintains that he deliberately delayed plaintiff's transport to the hospital for treatment on November 5.[3]  The record shows that plaintiff left for the hospital about 70 minutes after Scullion learned of his overdose, which does not seem at all unreasonable under the circumstances here, including plaintiff's initial refusal to exit his cell and later refusal to be examined by a nurse.  More importantly, even assuming this delay could be deemed unreasonable, plaintiff does not specify *what* Scullion did specifically that caused any delay, or what delay Scullion was aware of and ignored.

---

[3] In his motion for summary judgment, plaintiff also suggests that Captain Hulce is liable for intentionally delaying treatment.  (Dkt. #35 at 10.)  However, plaintiff was not granted leave to proceed against Hulce on that claim (*see* dkt. #12 at 11), and he has not sought reconsideration of the court's screening order, so the court will not address plaintiff's arguments on this issue as untimely.

Moreover, plaintiff does not dispute that *he* initially refused to leave his cell and then refused medical treatment in the HSU, or that a nurse had to call the on-call doctor to approve hospital treatment, or that security staff must follow certain safety and security protocols before allowing inmates out of restrictive housing and the institution.

In support of his claims, plaintiff points out that his inmate complaint alleging a delay in medical treatment was affirmed, but the inmate complaint examiner found a delay "based on documentation" without mentioning Scullion.  (Dkt. #38-11 at 2-3.)  Because plaintiff does not present evidence from which a reasonable jury could attribute purposeful or even negligent delay to Scullion, he is entitled to summary judgment on plaintiff's claims against him.

## B. Plaintiff's Claims against Defendants Lange, Thielen and Keehn will Proceed to Trial

There are genuine issues of material fact that preclude summary judgment in favor of the remaining state defendants Lange, Thielen, and Keehn, on plaintiff's claims arising out of the November 5 and November 20 incidents.

The state defendants do not dispute for purposes of summary judgment that plaintiff faced an objectively serious risk of harm during those incidents (dkt. #59 at 19), and they acknowledge that the parties dispute material facts with respect to Lange and Thielen's involvement in plaintiff's November 5 overdose, along with Officer Keehn's mishandling of plaintiff's medications on November 20 (dkt. #99 at 7-8).  First, the parties offer conflicting evidence as to whether Riley told Sergeant Lange that he was suicidal and whether Sergeant Lange repeatedly turned off the intercom and ignored Riley's attempts

to be heard.  The parties' evidence also leaves open to dispute whether Riley told Officer Thielen that he was suicidal and whether Thielen ignored this information.  Thus, there are key credibility determinations for a jury to make as to the November 5 incident.  *See Anderson*, 477 U.S. at 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

The same is true for the November 20 incident involving Officer Keehn, although it presents a closer question, particularly regarding plaintiff's claim of deliberate indifference.  Indeed, it appears undisputed that Keehn initially accepted the Tylenol from plaintiff and gave it to Sergeant Zimmer.  Moreover, there was no confirmation on plaintiff's cell door that he was on a no-KOP restriction and as nonmedical staff, Keehn may generally rely on the medical judgment of HSU staff in issuing medication.  *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel.").  However, Keehn failed to confirm plaintiff's no-KOP restriction in the institution's database or by reviewing plaintiff's restriction letter, as Zimmer did, before returning the medication to plaintiff.  A jury might reasonably infer that Keehn was negligent, and even consciously disregarded a serious risk of imminent harm to plaintiff, if it credits evidence that plaintiff had twice told Keehn that he was on a no-KOP restriction and could not have medication, especially when he gave the Tylenol *back* to plaintiff over his renewed objection, and purportedly affirmatively stating that he did not care.  *See Collins v. Grochowski*, No. 18-cv-1684, 2020 WL 514668, at *6-7 (E.D. Wis. Jan. 30, 2020) (an officer who delivered medication to an inmate on a no-KOP

restriction could be found deliberately indifferent to the inmate's risk of suicide if the officer was aware of the risk to the inmate's health by giving him pills yet told the inmate he did not care).

The state defendants alternatively argue that they are entitled to qualified immunity, contending that there is no clearly established constitutional right that required them "to take specific actions in their handling of . . . Riley's self-harm incidents." (Dkt. #59 at 28.) However, their argument is based on their version of the facts, and they admit to material disputes. Even under the doctrine of qualified immunity, the court must view all evidence in the light most favorable to plaintiff, making all reasonable inferences in his favor. *Price as next friend of J.K. v. Muller-Owens*, 516 F. Supp. 3d 816, 830 (W.D. Wis. 2021). It is also well-established that defendants cannot disregard a substantial risk of serious harm that plaintiff poses to himself. *See, e.g.*, *Miranda*, 900 F.3d at 349 (7th Cir. 2018) ("We repeatedly have recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need."). Accordingly, plaintiff's claims against defendants Lange, Thielen, and Keehn related to the November 5 and November 20 incidents will proceed to trial.

## C. Plaintiff's Negligence Claims against Pintz will Proceed to Trial

Finally, plaintiff would hold Nurse Pintz liable for twice issuing him a bottle of Tylenol to keep in his cell after he was placed on a no-KOP restriction. Pintz disputes that she issued plaintiff this medication, but the court will assume for purposes of summary judgment that she reviewed and signed the refill requests (*see* dkt. ##38-3; 38-4 (appearing to be signed "Pintz")) and that she owed plaintiff a duty of care in fulfilling his

15

prescriptions as an inmate at WSPF.  Even so, plaintiff cannot proceed on his Eighth Amendment claims against Pintz based solely on evidence that she processed two refill requests.  Unlike defendants Lange, Thielen and Keehn, plaintiff has offered no evidence within his personal knowledge regarding her subjective intent or any other evidence from which a jury could reasonably conclude that Pintz's actions were in reckless disregard in filling plaintiff's medications.  *See Grochowski*, 2020 WL 514668, at *5-6 (an HSU nurse was not liable under the Eighth Amendment for simply processing plaintiff's medication request while he was on a no-KOP restriction).

That said, plaintiff has also alleged state-law negligence claims against Pintz for which there is evidentiary support.  There is no dispute that plaintiff was on a no-KOP restriction that was placed in his HSU files and noticed to the HSU Nurses' Station. Nevertheless, Pintz argues that plaintiff's negligence claims fail because he has not produced evidence of compensable injury and because any injury would be too remote from her alleged acts of negligence.

As for the question of compensable injury, plaintiff asserts that he overdosed on the Tylenol that Pintz issued to him on November 24 and required hospital treatment.  To prevail on his negligence claims, plaintiff must prove that Pintz's actions actually caused him harm.  *Hennekens v. Hoerl*, 160 Wis. 2d 144, 152-53, 465 N.W.2d 812, 816 (1991) (plaintiff must identify evidence that defendants' negligent actions caused him "actual damage," harm that has already occurred or is reasonably certain to occur in the future). In fairness to Pintz, plaintiff has not presented any evidence that he needed significant medical intervention at the hospital, or medical evidence linking this overdose to kidney

16

damage or to the "side pain" he later complained about to the HSU nearly a year later. However, plaintiff did complain of abdominal pain and nausea at the hospital and attests that he continued to experience abdominal pain, as well as vomiting, gastric distress, dizziness, and bloody stools for at least several weeks. Although plaintiff's damages may be limited by the extent of actual harm he can establish, the court will not hold as a matter of law that plaintiff's assertions of ongoing pain and related symptoms are insufficient to hold Pintz liable for negligence.

Pintz also contends that the chain of causation between her alleged negligent acts on November 7 and 11 and plaintiff's November 24 overdose is too attenuated to permit a finding of liability. Wisconsin courts consider six public policy factors when deciding whether to limit tort liability: (1) "the injury is too remote from the negligence"; (2) "[r]ecovery is too wholly out of proportion to the culpability of the negligent tort-feasor"; (3) "in retrospect it appears too highly extraordinary that the negligence should have brought about the harm"; (4) "[a]llowing recovery would place too unreasonable a burden upon [the tortfeasor]"; (5) "[a]llowing recovery would be too likely to open the way to fraudulent claims"; and (6) "[a]llowing recovery would enter a field that has no sensible or just stopping point." *Colla v. Mandella*, 1 Wis. 2d 594, 598-99, 85 N.W.2d 345, 347-49 (1957) (internal citations and quotation marks omitted).

Pintz argues the first factor is relevant here, noting that there are other events that occurred between plaintiff's receipt of two bottles of Tylenol and his overdose. "Causation is a factual question for a jury if reasonable people 'could differ on the issue'." *Webber v. Armslist LLC*, No. 21-3198, 2023 WL 3945516, at *13 (7th Cir. June 12, 2023) (quoting

17

*Morgan v. Pa. Gen. Ins. Co.*, 87 Wis. 2d 723, 275 N.W.2d 660, 666 (1979)).  Specifically, Pintz emphasizes the incident on November 20 when plaintiff surrendered the Tylenol to Keehn who then returned the medication to plaintiff and points out that there is no allegation that she provided plaintiff any other medication.  However, a jury may also reasonably conclude that twice issuing plaintiff a bottle of Tylenol over four days, which allowed him to stockpile medication while on a no-KOP restriction in the first instance, was a substantial factor in plaintiff's subsequent overdose on that medication just two weeks later.  *See Merco Distributing Corp. v. Commercial Police Alarm Co., Inc.*, 84 Wis. 2d 455, 458, 267 N.W.2d 652, 654 (1978) ("The test for whether negligence was causal is whether that negligence was a 'substantial factor' in causing the injuries" (citation omitted)). Accordingly, plaintiff's state-law negligence claims against Pintz may proceed to trial.

Because plaintiff's negligence claims "form part of the same case or controversy" as plaintiff's claims against Lange, Thielen, and Keehn, the court will exercise supplemental jurisdiction over them under 28 U.S.C. § 1367(a).  Now that the court has narrowed the claims and parties in this case, the remaining parties are reminded that they may contact the clerk's office to schedule mediation with Magistrate Judge Andrew Wiseman before trial.

ORDER

IT IS ORDERED that:

1)  Plaintiff Jimmy Riley's motion for summary judgment (dkt. #34) is DENIED.

2)  The state defendants' motion for summary judgment (dkt. #57) is GRANTED in part and DENIED in part as follows:

    a.  Plaintiff's policy and practice claims against defendants Boughton, Simcox, Hulce, Scullion, Zimmer, and Lange are DISMISSED with prejudice.

    b.  Plaintiff's Eighth Amendment and state-law negligence claims arising from specific incidents of self-harm against defendants Roth, Zimmer, and Scullion are DISMISSED with prejudice.

    c.  Plaintiff's Eighth Amendment and state-law negligence claims arising from specific incidents of self-harm against defendants Lange, Thielen, and Keehn will proceed to trial.

    d.  Defendants Boughton, Simcox, Hulce, Scullion, Zimmer, and Roth are DISMISSED from this lawsuit.

3)  Defendant Julie Pintz's motion for summary judgment (dkt. #53) is GRANTED in part and DENIED in part as follows:  plaintiff's Eighth Amendment claims against Pintz are DISMISSED with prejudice but plaintiff's state-law negligence claims against Pintz will proceed to trial.

Entered this 19th day of July, 2023.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge